UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER


| | | |
|---|---|---|
| VICKI LYNN FLEMING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:10-CV-25 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |


<u>**REPORT AND RECOMMENDATION**</u>

Vicki Lynn Fleming ("Plaintiff") brings this action under 42 U.S.C. §§ 402(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her disability insurance benefits ("DIB") and supplemental security income ("SSI"). Specifically, Plaintiff challenges the decision of an Administrative Law Judge ("ALJ") who found that Plaintiff was not disabled because she was capable of performing a limited range of light work. Plaintiff seeks a determination by the Court that she is disabled and an award of benefits or a remand. For the reasons stated below, I **RECOMMEND** that: (1) Plaintiff's motion for summary judgment [Doc. 16] be **GRANTED**; (2) Defendant's motion for summary judgment [Doc. 20] be **DENIED**; (3) the decision of Commissioner be **REVERSED**; and (4) this action be **REMANDED** to the Commissioner for further proceedings.

I.     **ADMINISTRATIVE PROCEEDINGS**

Over five years ago, on April 6, 2006, Plaintiff applied for disability benefits, alleging she

became disabled in March 2006 (Tr. 110). Plaintiff alleged a variety of physical complaints, including fibromyalgia, migraine headaches, carpal tunnel syndrome, right knee problems, arthritis, sleep apnea, restless leg syndrome, asthma, emphysema, acid reflux, hernia, bone deterioration, spinal bone spurs, hip problems, high blood pressure, and heart problems (Tr. 153). She also alleged mental impairments—namely, nerves and depression (Tr. 153). Her claim was denied initially in August 2006 and again on reconsideration in October 2006 (Tr. 66-69). On November 2, 2006, Plaintiff requested a hearing before an ALJ (Tr. 66-81). That hearing was held on June 12, 2008 (Tr. 30). Shortly after the hearing, in August 2008, the ALJ issued a written decision in which he found that Plaintiff was not disabled (Tr. 28-29). On March 1, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1).

## II.     ELIGIBILITY FOR DIB

The Social Security Administration determines eligibility for DIB by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(I-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant

is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). Between steps three and four, the ALJ assesses the claimant's residual functional capacity ("RFC"). *Id.* at 653. The claimant bears the burden to prove the severity of her impairments, but the burden shifts to the Commissioner at step five to show there are jobs she can perform despite her impairments. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## III.     FACTUAL BACKGROUND AND ALJ'S FINDINGS

The parties generally agree with respect to their summary of an administrative record whose bulk is more conveniently measured in pounds than in pages. The ALJ, too, devoted approximately six pages of his opinion to a similar summary of Plaintiff's testimony and treatment. Because my report and recommendation concludes this matter must be remanded for the Commissioner to properly address Plaintiff's mental impairments, it will include evidence of Plaintiff's physical impairments only as necessary to provide context for her mental health treatment.[1]

### A.       Plaintiff's Testimony

Plaintiff, who earned a general equivalency degree, was 47 years old when her alleged disability began (Tr. 38, 105). Plaintiff alleges she was working as a welder and assembler for an auto parts manufacturer when her doctor "took [her] off work" on March 10, 2006, because of her right knee and left wrist problems (Tr. 153-54). Plaintiff testified she was fired because she was "off of work" for a long time due to her right knee problems (Tr. 39). She also complained of back and hip problems, for which she was taking anti-inflammatories (Tr. 42, 52). Plaintiff testified she had

---

[1] Under these circumstances, I will not address the parties' arguments regarding Plaintiff's physical impairments and limitations.

trouble holding and gripping things with her right hand due to carpal tunnel syndrome and with her left hand due to Kienbock's Disease[2] (Tr. 39-40). She said she experienced numbness in her arm on a daily basis (Tr. 52). Plaintiff also testified she suffered from high blood pressure and sleep apnea, but she was not currently taking medication and she did not have a CPAP machine because she did not have insurance (Tr. 41). Plaintiff complained of asthma, but admitted she smoked a pack of cigarettes per day (Tr. 41). She mentioned she had been diagnosed with restless leg syndrome and fibromyalgia (Tr. 42-43). She rated her chronic pain at seven on a scale of one to ten, but noted that her knee pain was sometimes extremely severe, "like a toothache" (Tr. 52-53).

Plaintiff testified rather extensively regarding how her ailments affected her functional abilities. She stated she lived in a garage apartment where she had to climb stairs, but she needed to use a railing and kept a chair at the top of the stairs so she could rest (Tr. 35-36, 49). Plaintiff stated she did not get any regular exercise and had gained about 40 pounds over the course of three years due to inactivity (Tr. 36-37, 45). She testified she could not kneel or stoop to pick something up and could not get up from the floor or out of the tub without help (Tr. 49-51). Plaintiff said she could drive an automatic vehicle (though not a stickshift), but she did not go out often (Tr. 37, 43-45, 47). She did some housework and cooked, but her son washed and lifted her iron skillets for her (Tr. 44-45, 48). Plaintiff stated she did not fry foods often because she had trouble standing long enough (Tr. 48). She testified she could stand for only 10-15 minutes at a time before needing to sit or lie down (Tr. 46). She spent most of her time watching TV, but she could only sit for 20-30 minutes at a time before she had to get up (Tr. 45). Plaintiff claimed she needed to lie down once

---

[2] Kienbock's Disease, which the ALJ described as a "necrosis" where "the bone has died," is spelled "Kimbach Disease" in the hearing transcript (Tr. 40).

4

every two to three hours (Tr. 47). She testified she could walk only short distances, and used a leg brace or cane about once a week (Tr. 46). Plaintiff stated she could lift a gallon of milk or two-liter soda if she held it next to her body, but not with her arms outstretched (Tr. 46). She regularly dropped things, and she could not thread a needle but she thought she could thread a nut onto a bolt (Tr. 46-47, 51).

With respect to mental impairments, Plaintiff stated she began receiving counseling and medication for depression and anxiety after she stopped working, which seemed to help "sometimes" (Tr. 42). She named "Dr. Webb" as her treating physician at CHEER Mental Health Center (Tr. 42). She testified she did not belong to any churches or clubs (Tr. 45). When Plaintiff's attorney examined her at the hearing, he did not ask her about functional limitations related to her mental health, and Plaintiff did not volunteer any such limitations (Tr. 46-53). Plaintiff's attorney did, however, question the vocational expert ("VE") about the vocational impact of limitations in interpersonal functioning, social activities, and ability to control behavior (Tr. 57-58), limitations he presumably derived from the CHEER functional assessment that is of central importance to this appeal.

### B. Physical Health Treatment Summary

While Plaintiff's wrist-related problems date back to before 1996, most of the treatment notes in the voluminous record are dated 2005 and later. Plaintiff has received treatment for various physical complaints, including knee and leg pain (Tr. 315-18, 1121-22), neck and back pain (Tr. 258), chest pain (Tr. 639-48), wrist necrosis (Tr. 320), carpal tunnel syndrome (Tr. 201, 1048-49), headaches (Tr. 320), gastroesophageal reflux disease (Tr. 793-94), fibromyalgia (Tr. 213-14, 259), sleep disorder (Tr. 757-58), and hypertension (Tr. 321). Objective tests have confirmed the

5

diagnoses underlying many of her complaints (*e.g.*, Tr. 201, 262, 265, 1119, 1124), and the ALJ

found that her medically determinable impairments could reasonably be expected to cause some of

her alleged symptoms (Tr. 26). She has been treated with pain injections (Tr. 315, 1031, 1033), knee

surgery (Tr. 317), carpal tunnel release surgery (Tr. 394), physical therapy (Tr. 764-75), and pain

medication (Tr. 1119). As the ALJ noted, Plaintiff's physicians have placed her on various work

restrictions due to her physical health complaints (Tr. 22-23). A consultative examiner, Timothy

Fisher, M.D., believed that Plaintiff's wrists were her main problem; he opined that she would have

difficulty performing any job that required repetitive gripping or manipulation of objects (Tr. 325).

### C.     Medical Treatment and Opinion Evidence Related to Mental Impairments

The documentation of Plaintiff's mental health complaints is found primarily in treatment

records from CHEER Mental Health Center. Plaintiff received treatment there between January

2007 and November 2008 (Tr. 870-939, 1346-73, 1531-97, 1792-1812), but only the records from

January 2007 to May 2008 were in the record before the ALJ (*see* Tr. 4-5).[3] In addition to those

records, Plaintiff reported that she had received mental health treatment as a teenager and she had

previously been on antidepressant medication (Tr. 915, 925). Plaintiff's primary care physician, J.R.

Troop, M.D., remarked in May 2002 that Plaintiff felt "fatigued" and "overwhelmed," and he

identified "probable depression" because of her symptoms (Tr. 248-49). Plaintiff was prescribed

an antidepressant, Nortriptyline, in early 2006 due to a suspected "myofascial pain disorder, with

sleep disturbance," but Dr. Troop did not include depression among Plaintiff's diagnoses until

March 2007 (Tr. 234, 236, 308, 420).

In June 2006, Plaintiff received a consultative mental health examination by William

---

[3] The later records were submitted to the Appeals Council after the ALJ's decision (Tr. 4-5).

O'Brien, Psy.D. (Tr. 307-12). Dr. O'Brien remarked that Plaintiff did not show any evidence of malingering, exaggeration, inconsistency, or lack of effort (Tr. 307). Plaintiff reported that she began experiencing symptoms of depression and anxiety in 1999, when her sister was murdered along with her niece and niece's friend (Tr. 308, 310, 883-84). She also reported difficulty coping with her physical limitations and financial problems, and she told Dr. O'Brien she felt worthless and hopeless (Tr. 310). She reported tearful episodes and sleep disturbance (Tr. 310). According to Dr. O'Brien, Plaintiff's mood was depressed, and her affect was congruent with her depressed mood, but there was no "overt evidence" of hallucinations or delusions (Tr. 309). Plaintiff did report fleeting suicidal ideation, but without intent or plan (Tr. 309). Dr. O'Brien diagnosed Plaintiff with an adjustment disorder with mixed anxiety and depressed mood and assigned a global assessment of functioning ("GAF") score of 65 (Tr. 311), which indicates "mild" symptoms, *see Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003). Dr. O'Brien believed Plaintiff was "experiencing moderate disruption in her ability to maintain concentration and persistence, remember moderate to complex instructions, as well as in her ability to maintain schedules and attendance," but she appeared able to maintain basic standards of neatness and cleanliness, work with others without distraction, accept criticism, and interact socially in an acceptable manner (Tr. 312).[4]

In January 2007, about seven months after Dr. O'Brien's examination, Plaintiff was first evaluated at CHEER by Karla Brock, Ph.D. (Tr. 925-32). Plaintiff reported trouble sleeping, weight gain, trouble concentrating, crying spells, mood swings, anhedonia, avolition, and some auditory and

---

[4] The following month, a non-examining state agency physician reached substantially the same conclusion regarding the severity of Plaintiff's mental impairments (Tr. 357).

visual hallucinations (Tr. 925).  Dr. Brock referred Plaintiff to counseling for "major depression" (Tr. 929).  Dr. Brock assessed Plaintiff with "marked" limitations in activities of daily living, "extreme" limitations in interpersonal functioning, "extreme" limitations in concentration, performance, and pace, and "marked" limitations in adapting to change (Tr. 930-32).  According to Dr. Brock's assessment, during the previous year, Plaintiff's periods of severe dysfunction accumulated to a total of six months or longer (Tr. 931).  Plaintiff was classified as a person with "severe and persistent mental illness," and she was assessed with a current GAF score of 50 (Tr. 932), where a score between 41 and 50 corresponds to a "serious" psychological impairment with symptoms such as suicidal ideation, *see Nowlen*, 277 F. Supp. 2d at 726.

Shortly after that initial assessment, Plaintiff began counseling on an outpatient basis (Tr. 876).  She reported she "hurt[] all the time," that she felt like a failure, and that her father and her ex-husband had been abusive (Tr. 876, 925).  Curiously, Plaintiff had previously told Dr. O'Brien that her father had been "loving and supportive" (Tr. 308).  The notes from Plaintiff's counseling sessions focus primarily on external stressors:  her physical health problems, her claim for worker's compensation, and the loss of her home and cars because of her inability to work (Tr. 877, 879).  Plaintiff frequently reported difficulty paying her rent (*e.g.*, Tr. 891, 896, 899, 905).  She stated in March 2007 that she was in "desperate straits financially," and her counselor noted she was "grieving the loss of health and identity as a result of physical disability" (Tr. 880).

In early April 2007, Plaintiff admitted to wishing she was not alive, and she was described as "very depressed," so she was referred to Glenn Webb, M.D. (Tr. 882-83, 915).  At that time, Plaintiff was having difficulty coping with the 1999 murder of her sister, niece, and niece's friend; Plaintiff wrote the murderer a note in prison, "simply ask[ing] why" (Tr. 883-84, 887).  She told Dr.

8

Webb that she had seen the burned bodies of her family members and still had nightmares and flashbacks about the experience (Tr. 915). Dr. Webb diagnosed her with severe, recurrent major depressive disorder and acute post-traumatic stress disorder (Tr. 916). He noted she had a current GAF of 50 (Tr. 916). Dr. Webb prescribed several medications (Tr. 916). Plaintiff also expressed frustration with the delay in getting her social security hearing (Tr. 882).

Over the next several months, Plaintiff continued to report stress due to her sister's murder, her financial situation, difficulties with her sons, and health problems, but she was hopeful she would begin receiving checks for a worker's compensation settlement (Tr. 886-94). In July 2007, Plaintiff's counselor noted she still had "severe" depression and that her progress was "very limited" (Tr. 895, 897). At an appointment with Dr. Webb that month, Plaintiff was "tearful [the] whole time" (Tr. 920). No significant changes were reported until September 2007, when Plaintiff's "best and only friend" died unexpectedly (Tr. 898-905, 906-07). In October, she reported she had experienced a mild heart attack and then had experienced suicidal ideation when she ran out of food and her son gave him a "difficult time" about it (Tr. 909). And in November, Plaintiff reported she was still no closer to a resolution of her social security claim (Tr. 914). At each appointment through January 2008, Dr. Webb reported that Plaintiff's level of functioning remained unchanged or decreased slightly (Tr. 916, 918, 920, 922, 924, 1366).

Finally, however, some good news: Plaintiff reported in October 2007 that she received her first settlement check from her former employer, which she hoped would enable her to improve her living situation (Tr. 909). The good news, however, was short lived. In December 2007, Plaintiff learned that her worker's compensation checks would be discontinued in March 2008 (Tr. 1351). She also learned that she would lose her TennCare insurance at the beginning of 2008, which

9

worried her because of her numerous health problems (Tr. 1351).[5] She was "emotionally tired" and

wondered "what the point of continuing on was" (Tr. 1351). In January 2008, her landlord was

again asking her to move out, and Dr. Webb noted Plaintiff had "very negative thinking" (Tr. 1353,

1366).

Plaintiff continued in counseling twice per month (Tr. 1355-63). Her financial situation was

still grim; she learned in February 2008 that she might owe $900 in taxes for her worker's

compensation settlement, and she owed her landlord $800 in back rent (Tr. 1359). Her physical

problems continued to create stress, too. She was dealing with blood clots, and she was hospitalized

for pneumonia and pleurisy (Tr. 1360, 1361). In March 2008, Plaintiff was overwhelmed and told

her counselor she "didn't want to deal w[ith] it anymore," but denied suicidal ideation (Tr. 1362).

April and May of 2008 were better for Plaintiff in some respects. In April, Plaintiff told Dr.

Webb she was doing better after a recent nine-day hospital stay because she had gotten all her

medications, although she noted she would not be able to get them all after leaving (Tr. 1368). At

that appointment Dr. Webb noted that Plaintiff was having "no crying spells" and was "stressed but

not depressed" (Tr. 1368). For the first time, Dr. Webb opined that Plaintiff had experienced a slight

improvement in her level of functioning (Tr. 1369). Dr. Webb did not, however, adjust Plaintiff's

GAF score, which remained at 50 (Tr. 1369). In May, Plaintiff was "very excited" because she had

gotten a hearing date for her social security disability benefits claim (Tr. 1364). Still, Plaintiff

reported she had been very upset because her personal belongings, which included her deceased

_____

[5] In January 2008, Plaintiff left the hospital without treatment for a blood clot because she
was told her insurance had run out (Tr. 1352, 1365). Her case manager, however, was able to
arrange for her medications to be filled, and she learned soon afterward that her insurance had not
yet been discontinued (Tr. 1352-53). Her insurance, however, did ultimately end in March 2008 (Tr.
1362).

mother's and sister's effects, were set to be sold if she could not pay $600 in storage fees (Tr. 1364). As stated above, Plaintiff's mental health treatment records end on this ambiguous note because subsequent records were not submitted to the ALJ.

### D. ALJ's Findings and Vocational Expert's Testimony

The ALJ found at step one of the sequential evaluation that Plaintiff was not, and had not been, performing any substantial gainful activity since the onset of her alleged disability (Tr. 18). At step two, the ALJ identified several severe impairments: bilateral carpal tunnel syndrome, left wrist necrosis, bilateral knee pain, sleep apnea, emphysema, hypertension, depression, and anxiety (Tr. 18). According to the ALJ, however, none of those impairments, alone or in combination, were severe enough to meet the criteria of any presumptively disabling impairment (Tr. 18). Specifically, with respect to Plaintiff's mental impairments, the ALJ found only "moderate" limitations in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 19). These limitations were insufficient to meet the applicable listing, which requires a "marked" limitation in at least two of those categories, or one "marked" limitation along with repeated episodes of decompensation. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04.

The ALJ found that Plaintiff retained the physical RFC to perform light work with several additional postural, manipulative, and environmental limitations (Tr. 19). With respect to Plaintiff's mental functional abilities, the ALJ explicitly adopted the opinions of Dr. O'Brien and the state agency reviewing consultant (Tr. 25-26). The ALJ found Plaintiff could "understand and carry out simple tasks or lower level detailed tasks while getting along with others and adapting at that level of functioning but she would not be able to perform more complicated tasks or deal with the public except in simple situations." (Tr. 19). According to the VE, a person with that RFC and Plaintiff's

11

age, education, and experience could perform unskilled, "mainly factory-paced" work such as gasket inspector, bearing ring assembler, wrapping machine tender, or electrical accessory assembler (Tr. 56-57). Within a 75-mile radius, there were about 900 such jobs (Tr. 57). If Plaintiff were limited further, however, with "extreme" limitations in interpersonal functioning or "marked" inability to adapt to change, she would not be able to perform any work (Tr. 57-58). Based on the VE's testimony and his RFC assessment, the ALJ found that Plaintiff could not perform any of her past work but could perform other work existing in significant numbers (Tr. 27). Accordingly, he found she had not been disabled from March 10, 2006, through the date of the decision, August 11, 2008 (Tr. 28-29).

## IV.    ANALYSIS

Plaintiff brings two main challenges to the ALJ's decision. First, Plaintiff argues that the ALJ did not take into account the opinion of her treating physicians at the CHEER Mental Health Center [Doc. 17 at Page ID # 50]. According to Plaintiff, the ALJ did not "provide a basis for discounting the significant limitations" assessed by CHEER physicians [Doc. 17 at Page ID # 51]. Second, Plaintiff argues that the ALJ erred by discounting the opinions of her orthopedic treating physicians, and that there is not substantial evidence to support the ALJ's finding that Plaintiff can walk and stand long enough to perform sustained work activities. Because I conclude that Plaintiff should prevail on the former challenge, I do not reach the latter.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner*, 375 F.3d at (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable

12

mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, \*6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at \*7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). Nonetheless, the court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

Evidence submitted to the court after the close of administrative proceedings cannot be

considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th

Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the

Appeals Council declines to review the ALJ's decision, that new evidence may not be considered

during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Instead, the

new evidence can be considered only for purposes of remand pursuant to sentence six of 42 U.S.C.

§ 405(g), which authorizes the court to remand a case for further administrative proceedings "if the

claimant shows that the evidence is new and material, and that there was good cause for not

presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.

1996).

### B. CHEER Assessment

As noted, Plaintiff argues that the ALJ did not provide a basis for rejecting the opinion of

her treating physicians at CHEER. Missing from the ALJ's opinion, according to Plaintiff, is any

meaningful discussion of the evaluation which assessed Plaintiff with "marked" limitations in

activities of daily living, "extreme" limitations in interpersonal functioning, "extreme" limitations

in concentration, performance, and pace, and "marked" limitations in adapting to change (Tr. 930-

32). As Plaintiff notes, the VE testified that those limitations would preclude any work. In

response, the Commissioner concedes that "the ALJ did not expressly refer to the limitations" in the

CHEER opinion, but argues nonetheless that the ALJ "clearly considered Plaintiff's treatment at

CHEER." [Doc. 21 at Page ID 85]. The Commissioner's response is accurate, as far as it goes, but

ultimately immaterial. The ALJ did, in fact, acknowledge Plaintiff's treatment at CHEER for "major

depressive disorder, recurrent, severe . . . [and] post-traumatic stress disorder, acute" (Tr. 25). The

ALJ also noted her GAF score of 50 (Tr. 25). It is important, however, to distinguish between the

14

CHEER treatment notes and the opinion which assessed Plaintiff with various "marked" and "extreme" limitations.[6] Plaintiff's physicians at CHEER noted repeatedly after this initial opinion was formed that Plaintiff's level of functioning either remained unchanged or decreased slightly. Despite acknowledging Plaintiff's *treatment*, at no point did the ALJ acknowledge the existence of the *opinion* at issue here. In fact, the ALJ stated bluntly that there were no medical opinions in the record, from treating physicians or otherwise, offering limitations severe enough to preclude all work (Tr. 26, 27).[7]

The Commissioner offers two possible reasons that the ALJ *could* have rejected the CHEER opinion,[8] but he offers no justification for the ALJ's failure to even mention that opinion. The Commissioner's response is therefore hard to square with the familiar procedural requirement of the "treating physician rule," under which the ALJ must give "good reasons" for rejecting the opinion of a treating physician. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)). Failure to comply with this "mandatory procedural protection" requires reversal, even if substantial evidence otherwise supports the ALJ's findings, unless the error is "a harmless *de minimis* procedural violation." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409

---

[6] The Commissioner refers to the CHEER opinion as an "assessment" or "report," but it is clearly a medical opinion. *See* 20 C.F.R. § 404.1513(b)(6), (c)(2); 404.1527(a)(2).

[7] The ALJ stated first that "[w]hile the claimant complaints [sic] of . . . depression and anxiety, . . . a review of the records in this case reveals no restriction of 12-month duration or more has been recommended by the treating doctors." (Tr. 26). The ALJ also stated, "[w]hile the claimant does have some restrictions from her impairments, . . . [n]o physicians, including her treating physicians, have noted that these conditions would preclude all types of work. While the claimant suffers from depression and anxiety, there is no objective evidence that indicates these conditions would preclude all types of work." (Tr. 27).

[8] As discussed below, the Commissioner argues that Dr. Brock, who offered the "marked" and "extreme" limitations, had seen Plaintiff only once when she formed that opinion. The Commissioner also argues that the CHEER opinion is not supported by objective evidence.

15

(6th Cir. 2009) (*citing Wilson*, 378 F.3d at 547). I **FIND** the ALJ failed to give good reasons for discounting the opinion of Plaintiff's treating physicians at CHEER, and this matter must therefore be remanded unless the error was *de minimis*.[9]

A violation may be harmless for any of three reasons. First, if the Commissioner ultimately adopts an RFC consistent with the treating physician's opinion, there is no harm in failing to say explicitly what weight it was given. *See Wilson*, 378 F.3d at 547. The ALJ's error, however, cannot be considered harmless on this ground because the CHEER limitations, according to the VE, would have precluded all work. A violation of the good reasons rule may also be considered harmless when the treating source's opinion was "so patently deficient that the Commissioner could not possibly [have] credit[ed] it," or where the Commissioner "has met the goal of . . . the procedural

––––––––––––––––––––

[9] This analysis, of course, assumes that the CHEER opinion comes from a treating source, which is defined as a physician "who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]. 20 C.F.R. 404.1502. A treating physician is contrasted with a physician whose opinion is sought "solely on [the claimant's] need to obtain a report in support of [a] claim for disability." *Id.*

CHEER's treatment program divides responsibility for case management, counseling, and medical treatment between its staff members. Dr. Brock, who offered the initial opinion, personally treated Plaintiff only from January to March of 2007, when Ronald Lee, MMFT, assumed primary responsibility for Plaintiff's counseling (Tr. 880). As noted above, however, Dr. Webb provided periodic assessments of Plaintiff's level of functioning during a treatment relationship that lasted through at least April 2008.

The Commissioner has not argued that CHEER is not a treating source. In addition, while the Commissioner notes that Dr. Brock had seen Plaintiff only once at the time she formed the initial opinion, the Commissioner fails to cite any authority that the existence of an ongoing treatment relationship must necessarily precede the physician's formation of the opinion. To the contrary, the length of the treatment relationship preceding the opinion appears to be merely one of several factors weighed in evaluating the opinion of a source who has already been recognized as a treating source. *See* 20 C.F.R. § 404.1527(d)(2)(i). For these reasons, I **FIND** that the CHEER opinion is a treating source opinion, entitled to the procedural protections prescribed by *Wilson*. *See Blakley*, 581 F.3d at 407 (stating that where ALJ does not make a finding with regard to whether a physician is a treating physician, the reviewing court decides the issue de novo).

16

safeguard of reasons." *Wilson*, 378 F.3d at 547. Each of these exceptions to the rule is discussed below.

### 1.      Was the CHEER Opinion "Patently Deficient"?

An opinion may be patently deficient if the treating source offers no explanation to support it. *See May v. Astrue*, 2009 WL 4716033 at *8 (S.D. Ohio 2009) (finding opinion patently deficient where source simply checked boxes about plaintiff's grasping ability and failed to provide supporting explanations or objective evidence). On the other hand, if a treating physician's opinion is consistent with her treatment of the plaintiff, the opinion cannot be considered patently deficient. *Blakely*, 581 F.3d at 409-10. *See also Wetherington v. Astrue*, 2010 WL 897249 at *6 (E.D. Ky. 2010) (remanding because ALJ did not show how physician's opinion was inconsistent with objective evidence in record); *Davis v. Astrue*, 2010 WL 546444 at *7 (E.D. Tenn. 2010) (finding that opinion was not patently deficient because source's notes and referral of plaintiff to physical therapy were not inconsistent with his opinion). In addition, a treating physician's opinion is less likely to be patently deficient when it is based on a lengthy treating relationship. *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir. 2005).

Without expressly arguing that the CHEER opinion is patently deficient, the Commissioner does argue that it is not supported by the accompanying treatment records. To the contrary, I **FIND** the opinion is well supported by contemporaneous treatment notes. Plaintiff was initially evaluated by a psychologist, Dr. Brock, who noted her weight gain, sleep disturbances, crying spells, mood swings, hallucinations, anhedonia and avolition, and trouble concentrating (Tr. 925). Dr. Brock also noted the existence of significant external stressors affecting Plaintiff's mental well being (Tr. 925). I **FIND** that Dr. Brock's initial evaluation supported the opinion at issue here. In addition,

subsequent treatment by a psychiatrist, Dr. Webb, showed that Plaintiff's condition remained unchanged or became slightly worse until 15 months later, in April 2008, when a slight improvement was finally noted. Consequently, the opinion provides support for the existence of a disability that meets the 12-month durational requirement of 42 U.S.C. § 423(d)(1)(A). It is possible that the ALJ could have found good reasons to conclude that the CHEER opinion was too restrictive in light of the other evidence in the record, but I **FIND** that the opinion was supported by the treatment Plaintiff received at CHEER, and I therefore **CONCLUDE** that it was not patently deficient.

### 2. Did the ALJ Meet the Goal of the Good Reasons Rule?

The goal of the good reasons rule, according to the *Wilson* court, is to ensure that a claimant is not left bewildered when an ALJ concludes that her doctor is wrong about her impairments. *See Wilson*, 378 F.3d at 544. An ALJ's written decision can meet this goal if it indirectly attacks the "consistency" or "supportability" of the opinion by discussing, for example, an absence of clinical and diagnostic findings. *See Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006) (acknowledging the treating sources' opinions and implicitly giving reasons for rejecting them in language preferring non-treating source opinions). It is a "rare case," however, where an ALJ's opinion will meet "the goal of the rule even if not meeting its letter." *Nelson*, 195 F. App'x at 472. It is not enough that the ALJ's decision show that he did in fact reject the treating physician's opinion; the decision must at least implicitly show *why* he rejected it. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010); *Hall*, 148 F. App'x at 464. *See also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010) (noting that the implicit reasons must be found in the ALJ's opinion itself).

In order to implicitly reject the restrictions in the CHEER opinion, the ALJ would have had

18

to, at the very least, explicitly *accept* other evidence, providing a rationale for accepting the other evidence which was inapplicable to the CHEER opinion. The ALJ did explicitly adopt the less restrictive assessment of Dr. O'Brien, the consultative examiner, on the basis that it "more than accommodate[d] the results of [Plaintiff's] objective tests . . . and clinical exams and . . . also accommodate[d] many of her subjective complaints." (Tr. 26). There is nothing in the ALJ's discussion of Dr. O'Brien's opinion, however, that provides any insight into why the ALJ might have discounted the CHEER opinion. In fact, as noted, the ALJ did not even acknowledge that there *existed* a medical opinion which would have precluded all work.

While the Commissioner has offered at least two potential reasons that the ALJ could have rejected the CHEER opinion, this Court cannot affirm the Commissioner's decision on the basis of a speculative, post-hoc rationalization. *See SEC v. Chenery*, 318 U.S. 80, 92-94 (1943). Simply put, the ALJ's opinion indicates that he failed to consider the CHEER *opinion* at all, and certainly does not articulate any grounds for rejecting it. This is therefore not the "rare case" in which the ALJ's opinion, while failing to meet the letter of the good reasons rule, nonetheless satisfies its goal. The silence of the ALJ's decision with respect to the CHEER opinion, is therefore reversible error. *See Wilson*, 378 F.3d at 546-47. Therefore, I **CONCLUDE** that this matter must be remanded to the Commissioner for further appropriate review.

19

## V.    CONCLUSION

For the foregoing reasons, I **RECOMMEND** that:[10]

> (1)    Plaintiff's motion for summary judgment [Doc. 16] be **GRANTED**.
>
> (2)    Defendant's motion for summary judgment [Doc. 20] be **DENIED**.
>
> (3)    The Commissioner's decision denying benefits be **REVERSED** and this action be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

s/ _Susan K. Lee_

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[10]    Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).